# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

**GLOBAL MILITARY PRODUCTS, INC.**

        Plaintiff,

vs.

**TRIPWIRE SOUTH LLC,** and **RYAN MORRIS,**

        Defendant.

Case No. _____

**JURY TRIAL REQUESTED**

## COMPLAINT

Plaintiff Global Military Products, Inc. ("Global" or "Plaintiff") by and through its undersigned counsel, files this Complaint against Defendants Tripwire South, LLC ("Tripwire") and Ryan Morris ("Morris") (collectively, "Defendants") and avers as follows:

1. Tripwire, through Mr. Morris, made false promises to GMP—and convinced GMP to remit more than $12 million in exchange for a commitment to make monthly deliveries of TNT that GMP could in turn sell to its own customers.

2. Tripwire touted its experience in the industry and world-wide connections to convince GMP to buy Tripwire's TNT.

1

3. But after the purchase order was signed and the checks issued, Tripwire failed to deliver. Rather than send 10,000,000 kg of TNT each month, Tripwire dissembled and provided updates about delays.

4. Lying to convince another party to enter into an agreement is fraud and failing to live up to contractual promises is breach of contract.

5. GMP is entitled to be made whole after suffering from Tripwire's fraud and breach of contract.

**PARTIES, JURISDICTION, AND VENUE**

6. Plaintiff, Global Military Products, Inc. ("GMP") is a Delaware company with a principal office at 2701 N. Rocky Point Dr., Suite 980, Tampa, Florida 33607.

7. Defendant, Tripwire South, LLC is a limited liability company with its principal place of business at 1475 Highland Avenue Road, Gettysburg, PA 17325.

8. While Tripwire was organized under the laws of the State of Florida, the state of filing of a limited liability company is not relevant for diversity purposes. A limited liability company is the citizen of every state where its members are citizens. Here, Tripwire's lone member is Skybolt Consulting Group, LLC ("Skybolt").

9. Skybolt is a limited liability company filed under the laws of the State of Delaware with its principal place of business in Pennsylvania.

10. In a lawsuit currently pending in the Middle District of Pennsylvania, Skybolt and Tripwire have admitted in other litigation that Tripwire's members consist of Pennsylvania citizens.

11. Likewise, in its filing with the Pennsylvania Secretary of State, Tripwire has indicated that its principal office, registered agent, mailing address, officers, and governors are all located in Pennsylvania.

12. Defendant, Ryan J. Morris is the founder and President of Tripwire South. Morris owns or controls a number of alter-egos sharing the Tripwire name, including Tripwire South and Tripwire Aviation. He is a resident and domiciliary of Pennsylvania.

13. This Court has diversity jurisdiction under 28 U.S.C. § 1332(a) because the matter in controversy exceeds $75,000.00, exclusive of costs, interest, and fees, and this suit is between citizens of different states.

14. GMP is a citizen of Florida, where it has its principal place of business, and Delaware, where it is incorporated.

15. Tripwire is a limited liability company whose ultimate membership consists of Pennsylvania citizens.

16. Ryan Morris is a citizen of Pennsylvania because he is domiciled in Pennsylvania.

17. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) and (c)(2) because a substantial part of the events or omissions giving rise to GMP's

claims occurred in the Middle District of Florida and the Parties agreed to resolve any disputes in a court of competent jurisdiction in Florida.

## NATURE OF THE ACTION

18. Tripwire convinced GMP that Tripwire could supply TNT that met the U.S. military's specifications.

19. Based on Tripwire's representations, GMP entered into a contract with Tripwire and paid Tripwire more than $12,000,000 as a deposit.

20. Despite the Contract including a strict delivery schedule, Tripwire delivered only empty promises and unfulfilled commitments—and no TNT.

21. Even worse, throughout the period of performance, Tripwire made additional statements that induced GMP to incur delivery costs—only to reveal at the last minute that there would be no TNT deliveries.

**A.  Tripwire Coaxes Tripwire to Pay a $12 Million Deposit**

22. On September 12, 2024, GMP and Tripwire entered into an agreement, Purchase Order GM24-0205.

23. To allow Tripwire to obtain the TNT it intended to sell to GMP, Tripwire convinced GMP that GMP must pay substantial deposits.

24. Tripwire told GMP that by paying these deposits, Tripwire would be able to obtain TNT from a supplier in Vietnam.

25. In reliance on Tripwire's statements that the payments were necessary to obtain the TNT from its Vietnamese source, GMP paid Tripwire $2,025,000 on September 19, 2024.

**B. Tripwire Agrees to Supply GMP with TNT on a Strict Schedule**

26. On October 31, 2024, GMP and Tripwire amended the Purchase Order GM24-0205, Amendment 001 ("Contract") to increase the quantity of TNT that Tripwire would deliver to GMP. *See* Exhibit 1.

27. Ryan Morris signed the Contract on behalf of Tripwire.

28. Under the Contract, Tripwire agreed deliver GMP 20,000,000 kg of TNT in accordance with Military Specification MIL-DTL-248D) according to the delivery schedule listed in the Contract's Annex 2:

| CY | Date | MT | KG |
|---|---|---|---|
| 1 | 24-Nov | 1000 | 1000000 |
| 1 | 24-Dec | 1000 | 1000000 |
| 1 | 25-Feb | 1000 | 1000000 |
| 1 | 25-Mar | 1000 | 1000000 |
| 1 | 25-Apr | 1000 | 1000000 |
| 1 | 25-May | 1000 | 1000000 |
| 2 | 25-Sep | 1000 | 1000000 |
| 2 | 25-Oct | 2000 | 2000000 |
| 2 | 25-Nov | 1000 | 1000000 |
| 2 | 25-Dec | 1000 | 1000000 |
| 2 | 26-Jan | 1000 | 1000000 |
| 2 | 26-Feb | 1000 | 1000000 |
| 2 | 26-Mar | 1000 | 1000000 |
| 2 | 26-Apr | 2000 | 2000000 |
| 2 | 26-May | 1000 | 1000000 |
| 2 | 26-Jun | 1000 | 1000000 |
| 2 | 26-Jul | 1000 | 1000000 |
| 2 | 26-Aug | 1000 | 1000000 |
| | | 20000 | 20000000 |

29. GMP agreed to pay Tripwire $11.00 per kilogram of TNT for a total value of $440,000,000.

30. In turn, GMP conveyed that the timing of the deliveries was critical.

31. To that end, the Contract stated that Tripwire shall be liable to GMP "for a penalty equal to 1% per month up to 8 months delinquent, cumulatively calculated" and that "[a]fter 8 months delinquent then a penalty of 8% shall apply."

32. The Contract explained that "[p]enalties apply to each shipment based upon the load date if not ready to load in accordance with" the delivery schedule.

33. The Contract also confirmed that the "penalty is in addition to any other remedies available under this contract."

34. The Contract also incorporated GMP's terms and conditions.

35. GMP's terms and conditions granted GMP the right to terminate the Contract in whole or in part by written notice of default if Tripwire fails to deliver the supplies within the time specified."

36. GMP's terms and conditions stated that if GMP terminates this Order in whole or in part, GMP may purchase similar supplies from others and Tripwire shall be liable for any additional costs above the original price for the terminated supplies.

37. GMP's terms and conditions also provide that "[d]isputes shall be resolved in a court of competent jurisdiction in the State of Florida, United States."

38. GMP agreed to make a 15% advance payment for the first increment of 6,000,000 kg within 30 days of signing the agreement and a 15% advance payment for an additional 4,000,000 kg within 15 days after the receipt and inspection of the first 1,000,000 kg shipment.

39. GMP agreed to remit the balance for each 10,000,000 kg batch after GMP's written acceptance.

40. The Contract also granted GMP the option to obtain an additional 20,000,000 kg of TNT according to a delivery schedule to be agreed on later.

41. The Contract confirmed that GMP "shall have exclusive rights to [Tripwire's] factory production for the term of the agreement.

**C.  Tripwire Delivers Excuses Instead of TNT**

42. Tripwire failed to deliver TNT to Tripwire, as required by the Contract.

43. On November 24, 2024, Tripwire failed to deliver the 1,000,000 kg of TNT required by the Contract.

44. On December 24, 2024, Tripwire failed to deliver the 1,000,000 kg of TNT required by the Contract.

45. On February 25, 2025, Tripwire failed to deliver the 1,000,000 kg of TNT required by the Contract.

46. On March 25, 2025, Tripwire failed to deliver the 1,000,000 kg of TNT required by the Contract.

47. On April 25, 2025, Tripwire failed to deliver the 1,000,000 kg of TNT required by the Contract.

**D.   Tripwire Induces GMP to Incur Delivery Costs with False Promises that a Delivery is Imminent**

48. Meanwhile, GMP and Tripwire engaged in discussions regarding Tripwire's delivery of the first shipment of TNT.

49. On February 28, 2025, Mr. Morris instructed GMP to "send an [End User Certificate] direct to Astor [Tripwire's subcontractor] so there is no delay and we can get this moving."

50. GMP responded the same day, attaching an updated End User Certificate and requesting that Tripwire provide a certificate of conformance to MIL-DTL-248D, a certificate of origin, a date when GMP could inspect the material, and estimated load dates.

51. Neither Mr. Morris nor anyone else from Tripwire responded to GMP's requests.

52. On March 4, 2025, GMP reiterated its request to Tripwire, asking that Tripwire provide a certificate of conformance to MIL-DTL-248D, a

8

certificate of origin, a date when GMP could inspect the material, and estimated load dates.

53. On March 11, 2025, Mr. Morris told GMP that "[a]ll documents will be received this week" and that "the ship can now be booked."

54. On April 16, 2025, GMP booked a vessel to transport TNT from Vietnam, based on Tripwire's statements that it would have a shipment of TNT ready to deliver.

55. In connection with securing the vessel, GMP placed a $875,222.38 non-refundable deposit.

56. After the vessel arrived in Vietnam at the agreed upon time, Tripwire revealed that the shipment of TNT was not ready and would not be ready for another 45-60 days.

57. As a result, GMP cancelled the vessel and was not refunded its $875,222.38 deposit.

### E. GMP Exercises Its Right to Collect Penalties

58. On May 19, 2025, GMP informed Tripwire that GMP was exercising its right to collect penalties ("Late Delivery Penalty Letter"). *See* Exhibit 3.

59. Specifically the Late Delivery Penalty Letter stated that "GMP was exercising its option to collect penalties from Tripwire for late deliveries in accordance with Section 6(a) Late Delivery of the Purchase Order Terms and

9

Annex 2 – Delivery Schedule, which states that "Seller shall be liable to Buyer for a penalty equal to 1% per month up to 8 months delinquent, cumulatively calculated."

60.     The letter informed Tripwire that, as of May 19, 2025, Tripwire owed GMP $5,060,000 in penalties.

**F.    GMP Issues Cure Notice to Tripwire Regarding Tripwire's Failure to Deliver Any TNT**

61.     On May 19, 2025, GMP issued a Notice to Cure Under Purchase Order GM24-0205 Amendment 001 ("Cure Notice").  *See* Exhibit 2.

62.     The Cure Notice demanded that Tripwire cure two ongoing contractual breaches.

63.     First, the Cure Notice stated that "Tripwire has failed to deliver the ordered supplies within the time specified by Annex 2 – Delivery Schedule of the Purchase Order."

64.     The Cure Notice stated that "Tripwire has ten days to cure this failure by delivering all 5,000,000 kg of late deliveries."

65.     In other words, the Cure Notice provided Tripwire until May 29, 2025 to deliver all 5,000,000 kg of late deliveries.

66.     Second, the Cure Notice explained that "Tripwire has violated the Purchase Order's Exclusivity Provision" by "actively offering its dedicated supply to other companies.

67. The Cure Notice stated that "Tripwire has ten days to cure this failure by identifying all offers made in violation of this agreement and re-affirming its commitment to provide GMP an exclusive supply of product during the Purchase Order's period of performance."

68. In other words, the Cure Notice provided Tripwire until May 29, 2025 to cure its breach of the exclusivity provisions.

### G. Rather than Curing its Default, GMP Continued to Default on TNT Shipments

69. Tripwire did not acknowledge receiving the Cure Notice.

70. On May 25, 2025, Tripwire failed to deliver the 1,000,000 kg of TNT required by the Contract.

71. A few days later, on May 29, 2025, Tripwire failed to cure its ongoing default by failing to deliver 5,000,000 kg of TNT required by the Contract.

72. The same day, Tripwire also failed to re-affirm its commitment to provide GMP an exclusive supply of product.

### H. GMP Terminates Tripwire for Default

73. On June 6, 2025, GMP terminated the Contract ("Termination Notice"). *See* Exhibit 4.

74. The Termination Notice explained that "[t]his termination is a Termination for Default in accordance with Section 14 of the GMP Terms and

11

Conditions, as Tripwire has breached its obligations under the Purchase Order in multiple ways."

75. The Termination Notice also demanded that "Tripwire must immediately return in full all advance payments made by GMP, including the $2,025,000.00 that Tripwire was paid on September 19, 2024 and the $10,125,000.00 that Tripwire was paid to on September 30, 2024. In addition, Tripwire must immediately pay $7,480,000.00 in late penalties, and $875,222.83 for other incurred costs."

76. Tripwire did not respond to the Termination Notice.

77. Tripwire did not pay GMP the $20,205.222.80 that it owed to GMP as a result of the termination.

## I. GMP Has Attempted to Reprocure the Required TNT Quantities from Other Sources

78. GMP has continued to try to obtain TNT from other sources.

79. GMP has incurred costs to identify and procure that same quantities of TNT that Tripwire contractually committed to providing.

## COUNT ONE
### Fraud

80. GMP incorporates the foregoing paragraphs 1 through 79 as if they were set forth herein.

81. Tripwire, through Morris and other agents, made false representations to GMP regarding TNT that Tripwire purportedly would be able to deliver to GMP including that:

   a. Tripwire could deliver 20,000,000 kg of TNT;

   b. Tripwire could meet the delivery schedule included in the Contract; and

   c. Tripwire would have a shipment ready for delivery in May 2025 and that GMP should book transportation for that delivery.

82. Tripwire and Morris knew these statements were false when Tripwire and Morris made these statements.

83. Alternatively, Tripwire and Morris made these statements with reckless disregard of their truth or accuracy.

84. Morris and Tripwire made these false representations intending to mislead GMP into believing that Tripwire had the capability of supplying 20,000,000 kg of TNT on a strict delivery schedule, and so that GMP would contract with Tripwire to purchase the same.

85. GMP was justified in relying on Tripwire's and Morris's false statements and would not have paid Tripwire nor incurred costs for transportation but for these false statements.

86. Even after convincing GMP to enter into an agreement with Tripwire, Tripwire and Morris continued to make false statements to GMP. Tripwire falsely claimed that it had deliveries ready for GMP to receive, when Tripwire knew that it did not have TNT available.

87. GMP incurred damages as a result of Morris and Tripwire's fraud, including the loss of the $12,150,000 that GMP paid Tripwire as a deposit for the initial deliveries of TNT, the $875,222.83 that GMP paid to secure a vessel to transport a delivery of TNT that was never made, and the cost of re-procuring replacement TNT, as well as further consequential and incidental damages.

88. GMP has also suffered substantial reputational damage due to Morris and Tripwire's fraudulent actions.

## COUNT TWO
### Fraud in the Inducement

89. GMP incorporates the foregoing paragraphs 1 through 79 as if they were set forth herein.

90. Tripwire, through Morris and other agents, made representations to GMP regarding TNT that Tripwire purportedly would be able to deliver to GMP including that:

    a. Tripwire could deliver 20,000,000 kg of TNT;

    b. Tripwire could meet the delivery schedule included in the Contract; and

    c. Tripwire would have a shipment ready for delivery in May 2025 and that GMP should book transportation for that delivery.

91. Tripwire and Morris knew these statements were false when Tripwire and Morris made these statements.

92. Alternatively, Tripwire and Morris made these statements with reckless disregard of their truth or accuracy.

93. Morris and Tripwire made these false representations intending to mislead GMP into believing that Tripwire had the capability of supplying 20,000,000 kg of TNT on a strict delivery schedule, and so that GMP would contract with Tripwire to purchase the same.

94. GMP was justified in relying on Tripwire's and Morris's false statements and would not have paid Tripwire nor incurred costs for transportation but for these false statements.

95. Even after convincing GMP to enter into an agreement with Tripwire, Tripwire and Morris continued to make false statements to GMP. Tripwire falsely claimed that it had deliveries ready for GMP to receive, when Tripwire knew that it did not have TNT available.

96. GMP incurred damages as a result of Morris and Tripwire's fraud, including the loss of the $12,150,000 that GMP paid Tripwire as a deposit for the initial deliveries of TNT, the $875,222.83 that GMP paid to secure a vessel to transport a delivery of TNT that was never made, and the cost of re-procuring replacement TNT, as well as further consequential and incidental damages.

97. GMP has also suffered substantial reputational damage due to Morris and Tripwire's fraudulent actions.

## COUNT THREE
## Breach of Contract

98. GMP incorporates the foregoing paragraphs 1 through 79 as if they were set forth herein.

99. GMP and Tripwire entered into a valid, enforceable agreement for Tripwire to provide 20,000,000 kg of TNT in 18 separate deliveries in exchange for GMP's payment of $12,150,000 and payment of the balance after each delivery.

100. GMP made its initial payments of $12,150,000 to fulfill its contractual obligations.

101. Tripwire failed to deliver the first six shipments of TNT in accordance with the contractual delivery schedule.

102. Tripwire failed to pay the penalties identified in the Contract when assessed by GMP for Tripwire's late deliveries.

103. GMP incurred damages as a result of Tripwire's breaches including the loss of the $12,150,000 that GMP paid Tripwire as a deposit for the initial deliveries of TNT, the $7,480,000 of unpaid penalties by the time the Contract was terminated, the $875,222.83 that GMP paid to secure a vessel to transport a delivery of TNT that was never made, and the cost of re-procuring replacement TNT, as well as further consequential and incidental damages.

## COUNT FOUR
### Unjust Enrichment

104. GMP incorporates the foregoing paragraphs 1 through 79 as if they were set forth herein.

105. Alternatively, Tripwire has been unjustly enriched by receiving and retaining GMP's initial payments of $12,150,000.

106. GMP conferred a benefit on Tripwire in the form of two payments totaling $12,150,000.

107. Tripwire accepted this benefit from GMP.

108. Tripwire has retained GMP's payments totaling $12,150,000, even though it has delivered zero kilograms of the 20,000,000 kg of TNT that it promised to deliver.

109. Tripwire has not provided anything else of comparable value to GMP.

110. Thus, it would be unjust and inequitable for Tripwire to keep GMP's $12,150,000.

111. GMP seeks the repayment of its two payments totaling $12,150,000 from Tripwire, as equity demands.

## PRAYER FOR RELIEF

**Wherefore**, Global Military Products, Inc. prays for relief as follows:

A. Enter judgment against Defendants for the amount of damages that Plaintiff proves at trial, but in any event in excess of $75,000.00;

B. Enter judgment awarding Plaintiff its expenses, costs, and attorneys' fees;

C. Provide such other and further relief as the Court deems just and proper.

Dated:   October 7. 2025     Respectfully submitted,

                                           */s/Michael S. Vitale*
Michael S. Vitale
Florida Bar No. 17136
**BAKER & HOSTETLER LLP**
200 South Orange Avenue, Suite 2300
Orlando, FL 32801-3432
Telephone:  407.649.4083
Email:  mvitale@bakerlaw.com
Secondary email: ybayala@bakerlaw.com

Kevin T. Barnett*
Kevin Dorn*
**BAKER & HOSTETLER LLP**
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC  20036-5403
Telephone:202.861.1500
Facsimile: 202.861.1783

Jenna Solari*
(*pro hac vice to be submitted)
**BAKER & HOSTETLER LLP**
1170 Peachtree Stree, Suite 2400
Atlanta, GA 30309-7676
Telephone: 404.682.2333
*Attorneys for Global Military Products, Inc.*