**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**GLOBAL MILITARY PRODUCTS, INC.**

        Plaintiff,

vs.

**TRIPWIRE SOUTH LLC, RYAN MORRIS, and CONAN HIGGINS**

        Defendant.

Case No. 8:25-cv-02731-JLB-CPT

**JURY TRIAL REQUESTED**

---

## FIRST AMENDED COMPLAINT

Plaintiff Global Military Products, Inc. ("GMP" or "Plaintiff") by and through its undersigned counsel, files this Complaint against Defendants Tripwire South, LLC ("Tripwire"), Ryan Morris ("Mr. Morris"), and Conan Higgins ("Mr. Higgins") (collectively, "Defendants") and avers as follows:

1.    Tripwire, through Mr. Morris, made false promises to GMP—and convinced GMP to remit more than $12 million in exchange for a commitment to make monthly deliveries of the explosive trinitrotoluene ("TNT") that GMP could in turn sell to its own customers.

2.    Tripwire touted its experience in the industry and world-wide connections to convince GMP to buy Tripwire's TNT.

3.   GMP was convinced to trust Tripwire as a result of the recommendation of GMP's then-general counsel, Mr. Higgins, who championed Tripwire as a partner for GMP.

4.   But after the purchase order was signed and the checks issued, Tripwire failed to deliver on its promises and contractual obligations to GMP.

5.   Rather than send 10,000,000 kg of TNT each month, Tripwire dissembled and provided updates about delays.

6.   At the same time and unbeknownst to GMP, Tripwire paid $700,000 to Mr. Higgins as a "commission"—even though Mr. Higgins was an employee of GMP at the time and owed a duty to GMP.

7.   Lying to convince another party to enter into an agreement is fraud and failing to live up to contractual promises is breach of contract.

8.   Giving anything of value to an employee of a federal government contractor in exchange for favorable treatment is a crime and a further breach of contract under GMP's Code of Business Principles.

9.   GMP is entitled to be made whole after suffering from Tripwire's fraud and breach of contract, as well as the actions of the individual Defendants, Mr. Morris and Mr. Higgins.

## PARTIES, JURISDICTION, AND VENUE

10.     Plaintiff, Global Military Products, Inc. is a Delaware company with a principal office at 2701 N. Rocky Point Dr., Suite 980, Tampa, Florida 33607.

11.     Defendant Tripwire South, LLC is a limited liability company with its principal place of business at 1475 Highland Avenue Road, Gettysburg, PA 17325.

12.     While Tripwire was organized under the laws of the State of Florida, the state of filing of a limited liability company is not relevant for diversity purposes.  A limited liability company is the citizen of every state where its members are citizens.  Here, Tripwire's lone member is Skybolt Consulting Group, LLC ("Skybolt").

13.     Skybolt is a limited liability company filed under the laws of the State of Delaware with its principal place of business in Pennsylvania.

14.     In a lawsuit currently pending in the Middle District of Pennsylvania, Skybolt and Tripwire have admitted that Tripwire's members consist of only Pennsylvania citizens.

15.     Likewise, in its filing with the Pennsylvania Secretary of State, Tripwire has indicated that its principal office, registered agent, mailing address, officers, and governors are all located in Pennsylvania.

16.     Defendant, Ryan J. Morris is the founder and President of Tripwire South. Mr. Morris owns or controls a number of alter-egos sharing the Tripwire name, including Tripwire South and Tripwire Aviation. He is a resident and domiciliary of Pennsylvania.

17.     Defendant, Conan J. Higgins is the former general counsel of Global Ordnance—GMP's parent company—and is currently counsel for Tripwire.  He is a resident and domiciliary of Georgia.

18.     This Court has diversity jurisdiction under 28 U.S.C. § 1332(a) because the matter in controversy exceeds $75,000 and this suit is between citizens of different states.

19.     GMP is a citizen of Florida, where it has its principal place of business, and Delaware, where it is incorporated.

20.     Tripwire is a limited liability company whose ultimate membership consists of only Pennsylvania citizens.

21.     Ryan Morris is a citizen of Pennsylvania because he is domiciled in Pennsylvania.

22.     Conan Higgins is a citizen of Georgia because he is domiciled in Georgia.

23.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) and (c)(2) because a substantial part of the events or omissions giving rise to GMP's

claims occurred in the Middle District of Florida and the Parties agreed to resolve any disputes in a court of competent jurisdiction in Florida.

## NATURE OF THE ACTION

24.    Tripwire and Mr. Morris convinced GMP that Tripwire could supply TNT that met the U.S. military's specifications.

25.    Based on Tripwire's representations and the self-interested counsel of Mr. Higgins, GMP entered a contract with Tripwire and paid Tripwire more than $12,000,000 as a deposit.

26.    Despite the Contract including a strict delivery schedule, Tripwire delivered only empty promises and unfulfilled commitments—and no TNT.

27.    Even worse, throughout the period of performance, Tripwire and Mr. Morris made additional statements that induced GMP to incur delivery costs—only to reveal at the last minute that there would be no TNT deliveries.

**A.    Tripwire, Conan, and Others Partner Behind GMP's Back**

28.    In 2023, Mr. Morris began discussing business opportunities with Mr. Patrick O'Shaughnessey and Mr. Henry Turnbull.  Mr. Turnbull and Mr. O'Shaughnessy told Mr. Morris that they had connections to procure TNT from Vietnam.  Mr. Morris believed that Tripwire could use its position in the United States for import/export and regulatory compliance.

29.    As the relationship developed, Mr. Morris entered into an agreement with Mr. O'Shaughnessy, Mr. Turnbull, and Mr. Higgins.

30.     Although the agreement between Mr. Morris, Mr. O'Shaughnessy, Mr. Turnbull, and Mr. Higgins was not formally documented, the four individuals agreed to share equally in any profit made under contracts which all four individuals worked on.

31.     On January 26, 2024, Mr. Higgins accepted an offer of employment from GMP's parent company, Global Ordnance, LLC ("Global") to serve as General Counsel.

32.     As part of Mr. Higgins' role as Global General Counsel, Mr. Higgins also served as the attorney for GMP.

33.     As a condition of employment, Mr. Higgins agreed to abide by Global's policies and procedures.

34.     Those policies and procedures included a provision on Conflicts of Interest that stated "If there is any actual or potential conflict of interest between you and a competitor, supplier, distributor, or contractor to the Company, you must disclose it to your Manager."

35.     Those policies and procedures also included a provision on Outside Employment that stated "Any outside employment that will conflict with your duties and obligations to the Company should be reported to your Manager."

36.     Mr. Higgins also entered into a Non-Disclosure and Non-Circumvention Agreement with Global as part of his employment.

37.    At no time did Mr. Higgins disclose his arrangement with Mr. Morris to his Manager as either a conflict of interest or outside employment.

## B.    Tripwire Agrees to Strict Ethical Standards as Part of Agreement with GMP

38.    In 2024, GMP needed a supply of TNT in accordance with Military Specification MIL-DTL-248D and on a strict delivery schedule.

39.    Mr. Higgins suggested that Tripwire could provide GMP with the TNT.

40.    Mr. Higgins did not reveal that he would benefit financially if GMP entered into an agreement with Tripwire.

41.    During discussions about a possible agreement, Mr. Morris was made aware that GMP was a Florida company based on GMP's office locations, communications related to supplying TNT, and all exchanged documentation including GMP's address.

42.    In May 2024, Mr. Morris attended Special Operations Forces ("SOF") Week in Tampa Florida, which was held from May 5, 2024 through May 8, 2024.

43.    While attending SOF Week, on May 8, 2024, Mr. Morris participated in discussions with GMP/Global employees Jeff Brunozzi, Mr. Higgins, and Bill Allen.

44.     During these discussions, Mr. Morris represented that Tripwire could obtain TNT from a Vietnamese source and meet GMP's strict delivery schedule.

45.     Despite both attending the meeting on May 8, 2024, neither Mr. Morris nor Mr. Higgins disclosed that Mr. Higgins would personally receive compensation from Tripwire if GMP agreed to a contract with Tripwire.

46.     On September 12, 2024, GMP and Tripwire entered into an agreement, Purchase Order GM24-0205.

47.     As part of the agreement, Tripwire agreed to Global's Code of Business Principles, which was incorporated in the agreement.

48.     Global's Code of Business Principles states in bold that "Global will decline any business opportunity that requires us or anyone we work with to participate in illegal or unethical activity, and we will not work with others that do not share this philosophy and practice."

49.     More specifically, Global's Code of Business Principles stated that business partners, like Tripwire, "must . . . [n]ot, directly or indirectly, offer or accept any form of bribe, kickback, or other corrupt payment from or to any person or organization, including government agencies, private companies and their respective employees or family member."

50.     The Code also stated that business partners, like Tripwire, "must . . . [e]nsure any gifts of hospitality offered to Global employees or any other

8

company employee are customary and reasonable in terms of value and frequency, and not intended to improperly influence a business decision or impair independence or judgment."

51.    GMP agreed to make a 15% advance payment for the first increment of 6,000,000 kg within 30 days of signing the agreement and a 15% advance payment for an additional 4,000,000 kg within 15 days after the receipt and inspection of the first 1,000,000 kg shipment.

52.    GMP agreed to remit the balance for each 10,000,000 kg batch after GMP's written acceptance

## C.    Tripwire Coaxes GMP to Pay a $12 Million Deposit, which Tripwire Used to Pay Kickbacks

53.    After entering into the initial agreement with GMP, Tripwire needed GMP to pay a substantial deposit.

54.    Tripwire convinced GMP that GMP must pay substantial deposits which Tripwire represented would be paid to Tripwire's supplier.

55.    Mr. Morris told GMP employees that by paying these deposits, Tripwire would be able to obtain TNT from a supplier in Vietnam.

56.    Mr. Higgins concurred with GMP paying these deposits and, as GMP's General Counsel, did not object to GMP paying these deposits.

57.    In reliance on Tripwire's statements that the payments were necessary to obtain the TNT from its Vietnamese source, GMP paid Tripwire $2,025,000 on September 19, 2024 and $10,150,000 on October 1, 2024.

58.    Tripwire did not disclose to GMP that Mr. Morris would use $700,000 of this deposit to pay Mr. Higgins for his involvement in brokering the deal, in accordance with the informal partnership between Mr. Morris, Mr. Higgins, Mr. O'Shaughnessy, and Mr. Turnbull.

59.    The $700,000 payment to Mr. Higgins constitutes "money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind."

60.    At the time Mr. Morris made the $700,00 payment to Mr. Higgins, Mr. Higgins was an employee of GMP and GMP was a prime contractor to the U.S. Government.

61.    At the time Mr. Morris made the $700,000 payment to Mr. Higgins, Mr. Morris knew that Mr. Higgins was an employee of GMP and GMP was a prime contractor to the U.S. Government.

62.    At the time Mr. Morris and Tripwire made the $700,000 payment to Mr. Higgins, Mr. Morris knew that Mr. Higgins was an attorney representing GMP.

63.    Mr. Morris made the $700,000 to Mr. Higgins to reward Mr. Higgins for providing favorable treatment to Tripwire in the negotiation and execution of Tripwire's contract with GMP.

10

64.     At the time Mr. Morris made the $700,000 payment to Mr. Higgins, Mr. Morris and Tripwire understood that the TNT Tripwire agreed to supply could in turn be sold to the U.S. Army.

65.     At the time Mr. Morris made the $700,000 payment to Mr. Higgins, Mr. Morris and Tripwire understood that Mr. Higgins was employed by Global.

66.     At the time Mr. Morris made the $700,000 payment to Mr. Higgins, Mr. Morris and Tripwire understood that Mr. Higgins was a lawyer who represented GMP.

## D.     Astor Reveals that Part of the Tripwire Price Will Be Used to "Take Care Of" Vietnamese Officials

67.     On October 24, 2024, GMP met with Mr. Henry Turnbull and Mr. Patrick O'Shaughnessy in Tampa, Florida to discuss other business opportunities between Mr. Marc Morales (Global's owner) and Astor (Mr. Turnbull's company).

68.     Mr. Turnbull proposed that Global and/or Mr. Morales could acquire ownership in Astor.

69.     Mr. Morales declined the offer to acquire an ownership stake in Astor.

70.    During the various discussions, Mr. Turnbull also stated that he would "take care of" Vietnamese officials as the lower tiered subcontractor in GMP's arrangement with Tripwire.

71.    Although Mr. Morales was unclear what Mr. Turnbull meant by this statement, Mr. Morales was nonetheless troubled and explained that GMP and Global do not engage in any type of improper payments to foreign officials.

72.    As a result and out of an abundance of caution, Mr. Morales instructed Astor that if the prior purchase price included any amounts that would be paid to 'take care of" Vietnamese officials, the purchase price would need to be reduced to remove any such payments because neither Global nor GMP engage in any type of improper payments to foreign officials.

**E.    Tripwire Agrees to Supply GMP with an Increased Volume of TNT on a Strict Schedule at the Reduced Price**

73.    On October 31, 2024, GMP and Tripwire amended the Purchase Order GM24-0205, Amendment 001 ("Contract") to increase the quantity of TNT that Tripwire would deliver to GMP and reduce the price per kilogram. *See* Exhibit A.

74.    Mr. Morris signed the Contract on behalf of Tripwire.

75.    Under the Contract, Tripwire agreed deliver GMP 20,000,000 kg of TNT in accordance with Military Specification MIL-DTL-248D) according to the delivery schedule listed in the Contract's Annex 2:

| CY | Date | MT | KG |
|----|------|------|---------|
| 1 | 24-Nov | 1000 | 1000000 |
| 1 | 24-Dec | 1000 | 1000000 |
| 1 | 25-Feb | 1000 | 1000000 |
| 1 | 25-Mar | 1000 | 1000000 |
| 1 | 25-Apr | 1000 | 1000000 |
| 1 | 25-May | 1000 | 1000000 |
| 2 | 25-Sep | 1000 | 1000000 |
| 2 | 25-Oct | 2000 | 2000000 |
| 2 | 25-Nov | 1000 | 1000000 |
| 2 | 25-Dec | 1000 | 1000000 |
| 2 | 26-Jan | 1000 | 1000000 |
| 2 | 26-Feb | 1000 | 1000000 |
| 2 | 26-Mar | 1000 | 1000000 |
| 2 | 26-Apr | 2000 | 2000000 |
| 2 | 26-May | 1000 | 1000000 |
| 2 | 26-Jun | 1000 | 1000000 |
| 2 | 26-Jul | 1000 | 1000000 |
| 2 | 26-Aug | 1000 | 1000000 |
| | | 20000 | 20000000 |

76.     GMP agreed to pay Tripwire $11.00 per kilogram of TNT for a total value of $440,000,000.

77.     In turn, GMP conveyed that the timing of the deliveries was critical.

78.     GMP had contracts with other entities, including the U.S. Government, which imposed penalties on GMP if GMP could not deliver by certain deadlines.

79.     To that end, the Contract stated that Tripwire shall be liable to GMP "for a penalty equal to 1% per month up to 8 months delinquent, cumulatively calculated" and that "[a]fter 8 months delinquent then a penalty of 8% shall apply."

80.    The Contract explained that "[p]enalties apply to each shipment based upon the load date if not ready to load in accordance with" the delivery schedule.

81.    The Contract also confirmed that the "penalty is in addition to any other remedies available under this contract."

82.    The Contract also incorporated GMP's terms and conditions.

83.    GMP's terms and conditions granted GMP the right to terminate the Contract in whole or in part by written notice of default if Tripwire fails to deliver the supplies within the time specified.

84.    GMP's terms and conditions stated that if GMP terminates this Order in whole or in part, GMP may purchase similar supplies from others and Tripwire shall be liable for any additional costs above the original price for the terminated supplies.

85.    GMP's terms and conditions granted GMP "exclusive rights to the Buyer's factory production for the term of the agreement, as well as option quantities."

86.    GMP's terms and conditions also provide that "[d]isputes shall be resolved in a court of competent jurisdiction in the State of Florida, United States."

87.    The Contract also granted GMP the option to obtain an additional 20,000,000 kg of TNT according to a delivery schedule to be agreed on later.

88.     The Contract confirmed that GMP "shall have exclusive rights to [Tripwire's] factory production for the term of the agreement."

89.     After receiving the deposit from GMP, Tripwire dispersed the funds to various individuals.

90.     Among those payments dispersing the downpayment funds, Tripwire paid Mr. Higgins a $700,000 commission.

**F.     Tripwire Tries to Convince Astor to Violate the Contract's Exclusivity Provisions**

91.     Mr. Morris and Tripwire were unhappy with the price reduction that Tripwire agreed to.

92.     As a result, Mr. Morris spent many months discussing with Mr. Turnbull and Mr. O'Shaughnessy finding another buyer for the TNT.

93.     In a sworn statement made in the United Kingdom, Mr. Morris admitted having discussions with Mr. Turnbull and Mr. O'Shaughnessy about circumventing the exclusivity provision in Tripwire's GMP Contract.

**G.     Tripwire Delivers Excuses Instead of TNT**

94.     Tripwire failed to deliver TNT to Tripwire, as required by the Contract.

95.     On November 24, 2024, Tripwire failed to deliver the 1,000,000 kg of TNT required by the Contract.

96.    On December 24, 2024, Tripwire failed to deliver the 1,000,000 kg of TNT required by the Contract.

97.    On February 25, 2025, Tripwire failed to deliver the 1,000,000 kg of TNT required by the Contract.

98.    On March 25, 2025, Tripwire failed to deliver the 1,000,000 kg of TNT required by the Contract.

99.    On April 25, 2025, Tripwire failed to deliver the 1,000,000 kg of TNT required by the Contract.

**H.    Mr. Higgins Abruptly Resigns as General Counsel**

100.    Mr. Higgins resigned from GMP on February 5, 2025.

101.    Mr. Higgins' last day was February 21, 2025.

102.    Mr. Higgins said that he resigned due to personal issues.

**I.    Tripwire Induces GMP to Incur Delivery Costs with False Promises that a Delivery is Imminent**

103.    Meanwhile, GMP and Tripwire engaged in discussions regarding Tripwire's delivery of the first shipment of TNT.

104.    On February 28, 2025, Mr. Morris instructed GMP to "send an [End User Certificate] direct to Astor [Tripwire's subcontractor] so there is no delay and we can get this moving."

105.    GMP responded the same day, attaching an updated End User Certificate and requesting that Tripwire provide a certificate of conformance to

MIL-DTL-248D, a certificate of origin, a date when GMP could inspect the material, and estimated load dates.

106.    Neither Mr. Morris nor anyone else from Tripwire responded to GMP's requests.

107.    On March 4, 2025, GMP reiterated its request to Tripwire, asking that Tripwire provide a certificate of conformance to MIL-DTL-248D, a certificate of origin, a date when GMP could inspect the material, and estimated load dates.

108.    On March 11, 2025, Mr. Morris told GMP that "[a]ll documents will be received this week" and that "the ship can now be booked."

109.    On April 16, 2025, GMP booked a vessel to transport TNT from Vietnam, based on Tripwire's statements that it would have a shipment of TNT ready to deliver.

110.    In connection with securing the vessel, GMP placed a $875,222.38 non-refundable deposit.

111.    After the vessel arrived in Vietnam at the agreed upon time, Tripwire revealed that the shipment of TNT was not ready and would not be ready for another 45-60 days.

112.    As a result, GMP cancelled the vessel and was not refunded its $875,222.38 deposit.

### J.     GMP Exercises Its Right to Collect Late Delivery Damages

113.    On May 19, 2025, GMP informed Tripwire that GMP was exercising its right to collect liquidated damages ("Late Delivery Damages Letter").  *See* Exhibit C.

114.    Specifically the Late Delivery Damages Letter stated that "GMP was exercising its option to collect penalties from Tripwire for late deliveries in accordance with Section 6(a) Late Delivery of the Purchase Order Terms and Annex 2 – Delivery Schedule, which states that "Seller shall be liable to Buyer for a penalty equal to 1% per month up to 8 months delinquent, cumulatively calculated."

115.    The letter informed Tripwire that, as of May 19, 2025, Tripwire owed GMP $5,060,000 in penalties.

### K.     GMP Issues Cure Notice to Tripwire Regarding Tripwire's Failure to Deliver Any TNT

116.    On May 19, 2025, GMP issued a Notice to Cure Under Purchase Order GM24-0205 Amendment 001 ("Cure Notice").  *See* Exhibit B.

117.    The Cure Notice demanded that Tripwire cure two ongoing contractual breaches.

118.    First, the Cure Notice stated that "Tripwire has failed to deliver the ordered supplies within the time specified by Annex 2 – Delivery Schedule of the Purchase Order."

119.   The Cure Notice stated that "Tripwire has ten days to cure this failure by delivering all 5,000,000 kg of late deliveries."

120.   In other words, the Cure Notice provided Tripwire until May 29, 2025 to deliver all 5,000,000 kg of late deliveries.

121.   Second, the Cure Notice explained that "Tripwire has violated the Purchase Order's Exclusivity Provision" by "actively offering its dedicated supply to other companies."

122.   The Cure Notice stated that "Tripwire has ten days to cure this failure by identifying all offers made in violation of this agreement and re-affirming its commitment to provide GMP an exclusive supply of product during the Purchase Order's period of performance."

123.   In other words, the Cure Notice provided Tripwire until May 29, 2025 to cure its breach of the exclusivity provisions.

**L.    Rather than Curing its Default, GMP Continued to Default on TNT Shipments**

124.   Tripwire did not acknowledge receiving the Cure Notice.

125.   On May 25, 2025, Tripwire failed to deliver the 1,000,000 kg of TNT required by the Contract.

126.   A few days later, on May 29, 2025, Tripwire failed to cure its ongoing default by failing to deliver 5,000,000 kg of TNT required by the Contract.

127.   The same day, Tripwire also failed to re-affirm its commitment to provide GMP an exclusive supply of product.

**M.   GMP Requests Mr. Higgins Provide Assurances Regarding His Relationship with Tripwire**

128.   After hearing that Mr. Higgins was providing legal advice to Tripwire, GMP, through counsel, sent a letter to Mr. Higgins on June 4, 2025.

129.   GMP's letter asked Mr. Higgins to confirm, out of an abundance of caution, that he had not advised or counseled Tripwire in any way regarding Global or GMP since Mr. Higgins tendered his resignation from Global.

130.   On June 6, 2025, Mr. Higgins responded to the letter and stated that the letter "serves as my assurance that I am not, nor have I counseled Tripwire in its dealings with Global Ordnance."

131.   Mr. Higgins also confirmed that he does "represent Tripwire in DDTC matters and ha[s] represented them in the past on deals with other companies, such as Bizzell."

132.   Mr. Higgins also stated that he "explained to Mr. Morris, and he understands, that [Mr. Higgins] cannot give advice regarding [GMP] as a former client and that to do so would be a conflict of interest and unethical."

**N.   GMP Terminates Tripwire for Default**

133.   On June 6, 2025, GMP terminated the Contract ("Termination Notice"). *See* Exhibit D.

134. The Termination Notice explained that "[t]his termination is a Termination for Default in accordance with Section 14 of the GMP Terms and Conditions, as Tripwire has breached its obligations under the Purchase Order in multiple ways."

135. The Termination Notice also demanded that "Tripwire must immediately return in full all advance payments made by GMP, including the $2,025,000.00 that Tripwire was paid on September 19, 2024 and the $10,125,000.00 that Tripwire was paid to on September 30, 2024. In addition, Tripwire must immediately pay $7,480,000.00 in late penalties, and $875,222.83 for other incurred costs."

136. Tripwire did not respond to the Termination Notice.

137. Tripwire did not pay GMP the $20,205.222.80 that it owed to GMP as a result of the termination.

138. On August 4, 2025, Mr. Morris confirmed that Tripwire was contractually obligated to provide TNT to GMP

139. On August, 4, 2025, Mr. Morris told Mr. Turnball and Mr. O'Shaughnessy that he "require[s] the vessel name and departure date immediately to transmit to [GMP]" because Tripwire "remain[s] contractually bound and under pending litigation."

## O.  GMP Attempts to Reprocure the Required TNT Quantities from Other Sources

140.  Tripwire's failure to cure its default left GMP in a position where it needed to deliver TNT to its customers to meet contractual obligations and avoid delivery penalties.

141.  GMP has continued to try to obtain TNT from other sources, but identified only Astor as willing to commit to provide TNT on the compressed schedule that GMP required.

142.  GMP has incurred costs to identify and procure the same quantities of TNT that Tripwire contractually committed to providing.

## P.  GMP Learns that Tripwire Has Made Similar Promises to Other Customers and Failed to Deliver or Return Deposits

143.  Since entering into the agreement with Tripwire, GMP has learned that several other customers have accused Tripwire and Mr. Morris of obtaining payment for explosives and related supplies and never delivering the agreed on supplies.

144.  According to one lawsuit, Tripwire entered into a contract with the Embassy of the State of Qatar ("Qatar") but failed to deliver the goods promised.

145.  On June 14, 2018, Qatar sued Tripwire Operations Group, LLC and Mr. Morris in the Superior Court for the District of Columbia.

146.  Qatar alleged that it placed an order with Tripwire Operations Group for various police and security-related goods costing $339,719.02.

147.    Qatar also alleged that from October 21, 2015 through March 14, 2017, the Embassy of Qatar repeatedly contacted Mr. Morris inquiring about the status of the purchased goods, but despite full payment, Tripwire Operations Group failed to deliver the purchased goods.

148.    Qatar and Tripwire Operations Group reached an out of court settlement.

149.    On December 2, 2020, Qatar filed another lawsuit against Tripwire Operations Group and Mr. Morris to enforce the prior settlement agreement.

150.    According to the second lawsuit, Tripwire entered into a contract with Bizzell Corp., accepted payments from Bizzell Corp. in exchange for $3,900,000, and did not deliver the agreed upon explosives to Bizzell.

151.    Bizzell filed a lawsuit, *Bizzell Corp. v. Tripwire South, LLC et al.*, No. 1:25-cv-00680-KMN (M.D. Pa.), to recover the amounts paid to Tripwire under theories of breach of contract, fraud, and unjust enrichment.

152.    According to a third lawsuit, Tripwire entered into a contract with RNR USA, LLC, but failed to deliver the explosives that Tripwire was contracted to supply.

153.    On December 15, 2025, RNR USA, LLC filed a lawsuit in the U.S. District Court for the Middle District of Pennsylvania against Tripwire, Mr. Morris, and Mr. Higgins (and others) alleging that "Tripwire fraudulently lured

[RNR] into contracting for the purchase of 30 metric tons of falsely advertised EDC-4 explosives worth $4.2 million."

154.    RNR further alleged that "Tripwire refused to return [RNR's] $2.1 million deposit after Tripwire failed to obtain the necessary export licenses it had so confidently touted, all while having produced EDC-4 explosives of a far lesser specification than agreed."

**Q.    Mr. Morris Has Used Tripwire and Other Tripwire Entities as Alter Egos While Diverting Tripwire Funds for His Own Personal Use**

155.    Mr. Morris has repeatedly used Tripwire and Tripwire's funds for his own personal use.

156.    Mr. Morris originally organized Tripwire by listing two individuals—Charles Arant and Susan Boully—as members who have since filed sworn affidavits that they were not members of Tripwire and had never been members of Tripwire.

157.    Mr. Morris used the money that GMP paid to Tripwire in order to make a $700,000 payment to Mr. Higgins as part of Mr. Morris' personal arrangement with Mr. Higgins.

158.    Despite filing a Chapter 7 Voluntary Bankruptcy petition for personal bankruptcy on October 3, 2024 and attesting to a joint monthly income of $10,547.65 and $11,461.95 in monthly expenses, Mr. Morris planned a June 2025 wedding at a luxury wedding hotel in County Kilkenny, Ireland.

159.  Upon information and belief, the funds for this elaborate wedding celebration came from Tripwire.

160.  Upon information and belief, Mr. Morris also diverted funds from Tripwire to other entities, such as Tripwire Aviation LLC, which purchased multiple helicopters, including an MD500D at a cost of $1 million, and a Hughes/Schweizer 269C.

161.  Upon information and belief, Mr. Morris also diverted funds from Tripwire by causing Tripwire to pay Mr. Morris $416,000 for 1800 Baltimore Pike, his granite quarry adjacent to Tripwire's headquarters in Gettysburg.

162.  All conditions precedent to the bringing of this action have occurred, or have been waived by the Defendants.

## COUNT ONE
### Fraud as to All Defendants

163.  GMP incorporates the foregoing paragraphs 1 through 162 as if they were set forth herein.

164.  Tripwire, through Mr. Morris and supported by Mr. Higgins, made false representations to GMP regarding TNT that Tripwire purportedly would be able to deliver to GMP including that:

    a.  Tripwire could deliver 20,000,000 kg of TNT;

    b.  Tripwire could meet the delivery schedule in the Contract; and

      c.  Tripwire would have a shipment ready for delivery in May 2025 and that GMP should book transportation for that delivery.

165.   Mr. Higgins advised GMP that it should proceed with Tripwire's proposal without revealing that Mr. Higgins would receive a $700,000 commission from Tripwire.

166.   Tripwire, Mr. Morris, and Mr. Higgins knew these statements were false when Tripwire and Mr. Morris made these statements.

167.   Alternatively, Tripwire, Mr. Morris, and Mr. Higgins made these statements with reckless disregard of their truth or accuracy.

168.   Mr. Morris and Tripwire made these false representations intending to mislead GMP into believing that Tripwire had the capability of supplying 20,000,000 kg of TNT on a strict delivery schedule, and so that GMP would contract with Tripwire to purchase the same.

169.   GMP was justified in relying on Tripwire's and Mr. Morris's false statements and would not have paid Tripwire nor incurred costs for transportation but for these false statements.

170.   Even after convincing GMP to enter into an agreement with Tripwire, Tripwire and Mr. Morris continued to make false statements to GMP. Tripwire falsely claimed that it had deliveries ready for GMP to receive, when Tripwire knew that it did not have TNT available.

171.    GMP incurred damages as a result of Mr. Morris, Mr. Higgins, and Tripwire's fraud, including the loss of the $12,150,000 that GMP paid Tripwire as a deposit for the initial deliveries of TNT, the $875,222.83 that GMP paid to secure a vessel to transport a delivery of TNT that was never made, and the cost of re-procuring replacement TNT, as well as further consequential and incidental damages.

172.    GMP has also suffered substantial reputational damage due to Mr. Morris, Mr. Higgins, and Tripwire's fraudulent actions.

## COUNT TWO
### Fraud in the Inducement as to All Defendants

173.    GMP incorporates the foregoing paragraphs 1 through 162 as if they were set forth herein.

174.    Tripwire, through Mr. Morris, Mr. Higgins, and other agents, made representations to GMP regarding TNT that Tripwire purportedly would be able to deliver to GMP including that:

a.    Tripwire was a reliable and trustworthy partner;

b.    Tripwire could deliver 20,000,000 kg of TNT;

c.    Tripwire could meet the delivery schedule in the Contract;

d.    Tripwire would have a shipment ready for delivery in May 2025 and that GMP should book transportation for that delivery; and

e.    Tripwire would abide by GMP's Conduct of Conduct, which prohibited kickbacks.

175.    Mr. Higgins advised GMP that it should proceed with Tripwire's proposal without revealing that Mr. Higgins would receive a $700,000 commission from Tripwire.

176.    Tripwire, Mr. Morris, and Mr. Higgins knew these statements were false when Tripwire and Mr. Morris made these statements.

177.    Alternatively, Tripwire, Mr. Morris, and Mr. Higgins made these statements with reckless disregard of their truth or accuracy.

178.    Tripwire, Mr. Morris, and Mr. Higgins made these false representations intending to mislead GMP into believing that Tripwire had the capability of supplying 20,000,000 kg of TNT on a strict delivery schedule, and so that GMP would contract with Tripwire to purchase the same.

179.    GMP was justified in relying on Tripwire's and Mr. Morris's false statements and would not have paid Tripwire nor incurred costs for transportation but for these false statements.

180.    Even after convincing GMP to enter into an agreement with Tripwire, Tripwire and Mr. Morris continued to make false statements to GMP. Tripwire falsely claimed that it had deliveries ready for GMP to receive, when Tripwire knew that it did not have TNT available.

181.    GMP incurred damages as a result of Mr. Morris, Mr. Higgins, and Tripwire's fraud, including the loss of the $12,150,000 that GMP paid Tripwire as a deposit for the initial deliveries of TNT, the $875,222.83 that GMP paid to secure a vessel to transport a delivery of TNT that was never made, and the cost of re-procuring replacement TNT, as well as further consequential and incidental damages.

182.    GMP has also suffered substantial reputational damage due to Mr. Morris, Mr. Higgins, and Tripwire's fraudulent actions.

### COUNT THREE
### Breach of Contract against Tripwire Only

183.    GMP incorporates the foregoing paragraphs 1 through 162 as if they were set forth herein.

184.    GMP and Tripwire entered into a valid, enforceable agreement for Tripwire to provide 20,000,000 kg of TNT in 18 separate deliveries in exchange for GMP's payment of $12,150,000 and payment of the balance after each delivery.

185.    GMP made its initial payments of $12,150,000 to fulfill its contractual obligations.

186.    Tripwire failed to deliver the first six shipments of TNT in accordance with the contractual delivery schedule.

187.    Tripwire failed to pay the penalties identified in the Contract when assessed by GMP for Tripwire's late deliveries.

188.    GMP incurred damages as a result of Tripwire's breaches including the loss of the $12,150,000 that GMP paid Tripwire as a deposit for the initial deliveries of TNT, the $7,480,000 of unpaid penalties by the time the Contract was terminated, the $875,222.83 that GMP paid to secure a vessel to transport a delivery of TNT that was never made, and the cost of re-procuring replacement TNT, as well as further consequential and incidental damages.

## COUNT FOUR
### Unjust Enrichment as to Tripwire

189.    GMP incorporates the foregoing paragraphs 1 through 162 as if they were set forth herein.

190.    Alternatively, Tripwire has been unjustly enriched by receiving and retaining GMP's initial payments of $12,150,000.

191.    GMP conferred a benefit on Tripwire in the form of two payments totaling $12,150,000.

192.    Tripwire accepted this benefit from GMP.

193.    Tripwire has retained GMP's payments totaling $12,150,000, even though it has delivered zero kilograms of the 20,000,000 kg of TNT that it promised to deliver.

194.   Tripwire has not provided anything else of comparable value to GMP.

195.   Thus, it would be unjust and inequitable for Tripwire to keep GMP's $12,150,000.

196.   GMP seeks repayment of its two payments totaling $12,150,000 from Tripwire, as equity demands.

## COUNT FIVE
### Unjust Enrichment as to Mr. Higgins and Mr. Morris

197.   GMP incorporates the foregoing paragraphs 1 through 162 as if they were set forth herein.

198.   Alternatively, Mr. Higgins and Mr. Morris have been unjustly enriched by receiving personal payments from GMP's initial payments to Tripwire.

199.   GMP conferred a benefit on Tripwire in the form of two payments totaling $12,150,000, who in turn conferred benefits on Mr. Higgins and Mr. Morris in the form of payments of at least $700,000.

200.   Mr. Higgins accepted this benefit from GMP's initial payments.

201.   Mr. Morris accepted this benefit from GMP's initial payments

202.   Mr. Higgins and Mr. Morris have retained their individual payments, even though Tripwire has delivered zero kilograms of the 20,000,000 kg of TNT that Tripwire and Mr. Morris promised to deliver.

203.  Mr. Higgins and Mr. Morris have not provided anything else of comparable value to GMP.

204.  Thus, it would be unjust and inequitable for Mr. Higgins and Mr. Morris to keep the payments.

205.  GMP seeks repayment of the individual payment to Mr. Higgins of at least $700,000 from Mr. Higgins, as equity demands.

206.  GMP seeks repayment of the individual payment to Mr. Morris of at least $700,000 from Mr. Morris, as equity demands.

## COUNT SIX
## Commercial Bribery as to Mr. Morris

207.  GMP incorporates the foregoing paragraphs 1 through 162 as if they were set forth herein.

208.  Under Florida law, a civil cause of action exists for criminal bribery under Florida Statute 772.104(1), which states that "[a]ny person who proves by clear and convincing evidence that he or she has been injured by reason of any violation of the provisions of [Fla. Stat.] 772.103 shall have a cause of action for threefold the actual damages sustained and, in any such action, is entitled to minimum damages in the amount of $200, and reasonable attorney's fees and court costs in the trial and appellate courts." Fla. Stat. § 772.104(1).

209.  Under Florida law, "[a] person commits the crime of commercial bribery if, knowing that another is subject to a duty described in Fla. Stat.

838.15(1) and with intent to influence the other person to violate that duty, the person confers, offers to confer, or agrees to confer a benefit on the other." Fla. Stat. § 838.16(1).

210.   In turn, Florida Statute Section 838.15(1) lists several types of relationships that have a statutory or common-law duty, including "[a]n agent or employee of another" and "[a] lawyer."  *Id.* § 838.15(1)(a), (c).

211.   Commercial bribery satisfies the prohibited acts requirement under Fla. Stat. 772.103 to allow a civil cause of action to be brought under Fla. Stat. § 772.104(1).  *See Ocean Communications, Inc. v. Jewelry Channel, Inc.,* Case No. 9:19-cv-81608-ROS, 2020 WL 2042393, *3 n. 2 (S.D. Fla. Apr. 28, 2020).

212.    Mr. Higgins owed a duty to GMP as its employee and attorney.

213.   Mr. Morris paid Mr. Higgins at least $700,000 while Mr. Higgins was an employee of GMP as part of a scheme between Mr. Morris, Mr. Higgins and others to obtain benefits for the group.

214.   In exchange for the $700,000 payment, Mr. Higgins violated his duty as an employee by not revealing the payment to GMP, violating GMP policies on receiving kickbacks, and revealing confidential information about contract discussion and contract administration issues.

215.   In exchange for the $700,000 payment, Mr. Higgins violated his duty as an attorney by not revealing the payment to GMP, violating GMP

policies on receiving kickbacks, and revealing confidential information about contract discussion and contract administration issues.

216.    GMP seeks treble damages for the harm caused by Mr. Morris' commercial bribery, which includes overcharging GMP to facilitate the bribery as well as costs associated with investigating the bribery in accordance with GMP's ethical obligations.

217.    GMP further seeks attorneys' fees and court costs.

## PRAYER FOR RELIEF

**Wherefore**, Global Military Products, Inc. prays for relief as follows:

A.    Enter judgment against Defendants for the amount of damages that Plaintiff proves at trial, but in any event in excess of $75,000;

B.    Enter judgment awarding Plaintiff its expenses, costs, and attorneys' fees;

C.    Provide such other and further relief as the Court deems just and proper.

Dated:      March 4, 2026                Respectfully submitted,

/s/ Michael S. Vitale
Michael S. Vitale
Florida Bar No. 17136
Email: mvitale@bakerlaw.com
Secondary email: ybayala@bakerlaw.com
orlbakerdocket@bakerlaw.com
Daniel D. Woodruff
Florida Bar No. 1059872
Email: dwoodruff@bakerlaw.com
Secondary email: lshahsailes@bakerlaw.com
**BAKER & HOSTETLER LLP**
200 South Orange Avenue, Suite 2300
Orlando, FL 32801-3432
Telephone: 407.649.4083

Kevin T. Barnett
(admitted pro hac vice)
Email: kbarnett@bakerlaw.com
Kevin Dorn
(admitted pro hac vice)
Email: kdorn@bakerlaw.com
**BAKER & HOSTETLER LLP**
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC  20036-5403
Telephone:202.861.1500
Facsimile: 202.861.1783

Jennifer G.  Solari
(admitted pro hac vice)
Email: jsolari@bakerlaw.com
**BAKER & HOSTETLER LLP**
1170 Peachtree Stree, Suite 2400
Atlanta, GA 30309-7676
Telephone: 404.682.2333
*Attorneys for Global Military Products, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 4, 2026, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

<u>*/s/ Michael S. Vitale*</u>
Michael S. Vitale