**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

GLOBAL MILITARY PRODUCTS, INC.
Plaintiff,

vs. Case No. 8:25-cv-02731-JLB-CPT

TRIPWIRE SOUTH LLC, RYAN MORRIS, and CONAN HIGGINS,
Defendants.

---

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT RYAN MORRIS' MOTION TO DISMISS THE AMENDED COMPLAINT FOR LACK OF PERSONAL JURISDICTION AND MOTION TO STRIKE**

Plaintiff, Global Military Products ("GMP") hereby files this Memorandum of Law in Opposition to Defendant, Ryan Morris' Motion to Dismiss the Complaint ("Motion").[1] As alleged in GMP's Amended Complaint (Doc. 39), Morris' tortious conduct and fraudulent statements directed at a company in Florida provides the necessary minimum contacts to establish personal jurisdiction.

## I. INTRODUCTION

In its Amended Complaint, GMP detailed how Ryan Morris ("Morris") committed intentional torts directed at a company Morris knew was located in Florida. GMP has pled the who, what, where, and when of Morris' fraudulent representations. GMP also detailed how Morris had a side agreement with various

---

[1] Ryan Morris filed his Motion on March 17, 2026. (*See* Doc. 45). Pursuant to Local Rule 3.01(d), GMP has 21 days to respond to the Motion. This response is therefore timely filed today—April 7, 2026.

individuals, including GMP's then-general counsel Conan Higgins, to pay a kickback to Higgins. Morris wants to sidestep responsibility for these actions through a series of jurisdictional arguments. But each argument fails.

First, Morris argues that the Court lacks personal jurisdiction because Florida's long-arm statute does not extend to him as a non-resident. This ignores long-standing Florida precedent that Florida's long-arm statute extends to a non-resident defendant alleged to have made fraudulent misrepresentations directed into Florida. *See, e.g., Wendt v. Horowitz*, 822 So.2d 1252, 1260 (Fla. 2002).

Second, Morris argues that due process would be offended by a Florida court having jurisdiction over his actions. Morris' argument again skips over many cases that confirm that commission of an intentional tort alone can provide sufficient minimum contacts to convey personal jurisdiction. *See, e.g.*, *Exhibit Icons, LLC v. XP Comps., LLC*, 609 F. Supp. 2d 1282, 1298 (S.D. Fla. 2009).

Third, Morris asserts that his status as a corporate officer protects him from this lawsuit. For example, he alleges that Florida's Corporate Shield Doctrine blocks GMP's claims. This doctrine offers no protection to corporate officers alleged to have committed intentional torts—as is the case here. *See, e.g.*, *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1344 (11th Cir. 2013) ("Importantly, however, under Florida law, this corporate shield doctrine is inapplicable where the corporate officer commits intentional torts."). Indeed, Florida has confirmed that "individual officers [like Morris] are personally liable for torts they commit, even if those torts arise from acts performed within the scope

of their employment." *Exhibit Icons*, 609 F. Supp. 2d at 1299 (citing *Fla. Specialty, Inc. v. H 2 Ology, Inc.*, 742 So. 2d 523, 527–28 (Fla. 1st DCA 1999)).

Fourth, Morris argues that GMP failed to plead its claims for Unjust Enrichment and Commercial Bribery. Morris is simply wrong on both accounts, as GMP adequately pleads the necessary elements of both counts.

## II. RELEVANT FACTUAL ALLEGATIONS

In 2024, GMP sought out to obtain TNT in accordance with certain military specifications. (Doc. 39 ¶¶ 1, 24, 46, 55). To this end, GMP engaged in discussions with Morris—the founder and President of Tripwire. (*Id.* ¶¶ 1, 16, 24, 42–44; **Ex. A**, Declaration of Jeffrey Brunozzi ("Brunozzi Dec.") ¶¶ 3–4). In May 2024, Morris traveled to Florida and engaged in discussions about supplying TNT with GMP employees including GMP employees Bill Allen and Conan Higgins. (Doc. 39 ¶¶ 42–45; Brunozzi Dec. ¶ 10). In September 2024, Morris conducted additional negotiations with GMP through messaging services, email, and telephone with GMP employees including John Summers and Joe Miozzi. (*See* Doc. 39 ¶ 46; Brunozzi Dec. ¶ 12). At that time, Morris knew that GMP was a Florida company based on these discussions, his trip to Florida, and that GMP's address was included in multiple correspondence. (Doc. 39 ¶¶ 41–43, 67; Brunozzi Dec. ¶ 5).

As part of these discussions from early May 2024 through October 2024, Morris represented to GMP that Tripwire could supply the requisite TNT on GMP's strict delivery schedule. (Brunozzi Dec. ¶¶ 6, 8, 10; *see* Doc. 39 ¶¶ 24, 46). Morris knew his representation was false when made. (Doc. 39 ¶¶ 166, 176). Even so, on

September 12, 2024, GMP relied on Morris' false representations and entered into an agreement with Tripwire. (*Id.* ¶¶ 46, 169, 179; Brunozzi Dec. ¶ 13).

After entering into the initial agreement, Morris made additional fraudulent representations between September 12, 2024 and September 19, 2024. (*See* Doc. 39). Morris also represented to GMP that GMP needed to pay substantial deposits to Tripwire to facilitate the acquisition of the TNT from Tripwire's Vietnamese source. (*Id.* ¶¶ 53–55). Again Morris knew his representation was false when made, and again GMP relied on Morris' representation. (*Id.* ¶¶ 166, 169, 176, 179). On September 19, 2024, GMP paid Tripwire a $2,025,000.00 deposit. (*Id.* ¶ 57). On October 1, 2024, GMP paid Tripwire another $10,125,000.000 deposit. (*Id.*).

Still under the belief that Tripwire could supply the requisite TNT, GMP amended the initial agreement to increase the quantity of TNT. (*Id.* ¶ 73). The parties entered into the agreement on October 31, 2024. (*Id.*). Morris signed the agreement. (*Id.* ¶ 74). Under its terms, Tripwire agreed to deliver 20,000,000 kilograms of TNT to GMP over 18 months, and GMP agreed to pay Tripwire $11 per kilogram of TNT. (*Id.* ¶¶ 75–76). GMP also agreed to make another deposit equal to 15% of the first 6,000,000 kilograms of TNT within 30 days. (*Id.* ¶ 51).

Tripwire failed to deliver the first three shipments of TNT to GMP. (*Id.* ¶¶ 94–99). On February 28, 2025, a few days after the third shipment was due, Morris represented that GMP could send an End User Certificate to Tripwire's subcontractor, and TNT shipments would begin. (*Id.* ¶ 104 ("[S]end an [End User Certificate] direct to Astor [Tripwire's subcontractor] so there is no delay and we

can get this moving."); Brunozzi Dec. ¶ 20). GMP complied. (Doc. 39 ¶ 105; Brunozzi Dec. ¶ 20). On March 11, 2025, Morris represented that the TNT was ready and GMP should book a ship to transport it from Vietnam. (Doc. 39 ¶ 108 ("All documents will be received this week" and "the ship can now be booked.")). GMP booked a ship, which required a $875,222.38 non-refundable deposit. (*Id.* ¶¶ 109–10; Brunozzi Dec. ¶¶ 25–27). Again, Morris knew his representations were false when made. (Doc. 39 ¶¶ 166, 176). Tripwire revealed that the TNT was not ready after the ship arrived in Vietnam, and GMP lost its deposit. (*Id.* ¶ 111–12). Despite numerous representations from Morris that Tripwire would be able to deliver 20,000,000 kilograms of TNT on the strict delivery schedule, GMP never received a single kilogram of TNT, and still has not to this date. (*See id.* 94–99, 125–27, 193; Brunozzi Dec. ¶¶ 28–29).

## III. MEMORANDUM OF LAW

### A. This Court has Personal Jurisdiction Over Morris.

#### 1. Legal Standard

The plaintiff has the initial burden to show a prima facie case of personal jurisdiction. *Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino*, 447 F.3d 1357, 1360 (11th Cir. 2006). If the defendant submits affidavits contradicting plaintiff's allegations, the burden shifts back to the plaintiff to produce evidence supporting personal jurisdiction, unless the defendant's affidavits contain only conclusory assertions against jurisdiction. *Id.* Where the complaint and supporting affidavits and documents conflict with the Defendants' affidavits, the

Court must construe all reasonable inferences in the plaintiff's favor. *Id.*

### 2. GMP Pleaded Sufficient Facts to Establish Personal Jurisdiction.

This Court has personal jurisdiction over Morris. To assess personal jurisdiction, the Court must conduct a two-step analysis. *See, e.g.*, *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 626 (11th Cir. 1996). First, the Court determines whether the complaint alleges sufficient facts to bring the defendant within the reach of Florida's long-arm statute. *Id.* Second, the Court asks whether plaintiff's assertion of jurisdiction comports with due process and traditional notions of fair play and substantial justice. *Id.* GMP's Complaint satisfies both tests.

First, GMP has pled sufficient facts to show that Morris' conduct subjects him to Florida's long-arm statute. Florida's long-arm statute extends this Court's personal jurisdiction over non-resident defendants that have committed a tortious act within the state. Fla. Stat. § 48.193(1)(a)(2). Courts have consistently interpreted this statute to encompass fraudulent acts committed outside the state but directed at individuals within Florida. *See, e.g.*, *Exhibit Icons*, 609 F. Supp. 2d at 1297 ("Fraud in the inducement and negligent misrepresentation are torts that can establish personal jurisdiction."); *see also Wendt*, 822 So. 2d at 1260 (finding long-arm jurisdiction over out-of-state defendant alleged to have made "telephonic, electronic, or written communications into Florida" and the cause of action arose from those communications); *Machtinger v. Inertial Airline Servs., Inc.*, 937 So.2d 730, 735 (Fla. 3d DCA 2006) (fraudulent misrepresentations made outside Florida and directed into Florida by phone, fax, and writings constitute

tortious acts committed within Florida under Florida's long-arm statute).

The same logic applies here. As alleged in GMP's Complaint, Morris made false representations to GMP regarding Tripwire's ability to deliver the quantities of TNT that GMP needed; the need for substantial downpayments; and the need for transportation for imminent deliveries. (*See* Doc. 39 ¶¶ 54, 55, 104, 108, 164, 168, 170, 174, 178, 180). In other words, Morris directed fraudulent statements into Florida—the same conduct that triggered the Florida long-arm statute in *Exhibit Icons* and *Wendt*. And just as in *Exhibit Icons* and *Wendt*, this Court should find that the same Florida long-arm statute encompasses Morris' tortious actions.

Morris' Motion tries to evade this clear basis for jurisdiction, by arguing that this "principle presupposes a well-pled tort based on those communications." (Doc. 45 at 7). But Morris does not challenge the sufficiency of GMP's tort-based claims: Count I alleged Fraud against all defendants (including Morris) and Count II alleged Fraud in the Inducement against all defendants. Thus, without a challenge to the sufficiency of these torts, there is no basis to conclude that those counts are not well pled. In turn, those unchallenged counts provide the necessary well-pled tort to confer personal jurisdiction under the Florida Long Arm Statute.

Second, exercising personal jurisdiction comports with the requirements of due process and notions of fair play and substantial justice. This second step requires its own analysis to determine whether (1) the defendant has sufficient "minimum contacts" with Florida, and (2) exercising jurisdiction offends notions of fair play and substantial justice. *Sculptchair*, 94 F.3d at 626. Morris committing

an intentional tort aimed at a Florida resident alone satisfies both prongs.

To establish minimum contacts, the Court must consider if the defendant's contacts with Florida relate to the plaintiff's cause of action, involve some purposeful availment of the privilege of conducting activities within the forum, and are such that he should reasonably anticipate being haled into court there. *Id.* at 631. The "minimum contacts" requirement "is satisfied if the defendant has 'purposefully directed' his activities at residents of the forum state, and the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Licciardello v. Lovelady*, 544 F.3d 1280, 1283 (11th Cir. 2008). "When an intentional tort is alleged, personal jurisdiction may be supported over a non-resident defendant who has no other contacts with the forum." *Exhibit Icons*, 609 F. Supp. 2d at 1298 (citing *Calder v. Jones*, 465 U.S. 783, 790 (1984)); *see also Licciardello*, 544 F.3d at 1286–88 (explaining that the "effects" test provides for the exercise of personal jurisdiction over non-resident defendants who commit an intentional tort aimed at the forum state that causes foreseeable harm in the forum state). Morris' alleged conduct falls within this rubric: GMP alleged he committed three intentional torts (fraud, fraud in the inducement, and commercial bribery) aimed at the forum state (a company headquartered in Florida) that caused harm to that company. (Doc. 39 ¶¶ 10, 19, 41, 163–72, 173–82, 207–17). GMP also alleges that some of the fraudulent statements were made while Morris traveled to Florida. (*See, e.g.*, *id.* ¶¶ 42–44). Thus, the minimum contacts requirement is satisfied.

To determine whether jurisdiction would offend the notion of fairness, the

Court must assess "the burden on the defendant, the interests of the forum ..., and the plaintiff's interest in obtaining relief." *Id.* (quoting *Asahi Metal Indus. Co. v. Superior Ct. of Cal.*, 480 U.S. 102, 113 (1987)). In similar cases, courts have found that exercising personal jurisdiction over corporate officers personally accused of tortious conduct would not be burdensome because "[g]iven [his] role with the corporate defendants, [he] will have a significant role in their defense ... will undoubtedly be a witness at trial and thus will not be unduly burdened by answering the claims against him in Florida." *Exhibit Icons*, 609 F. Supp. 2d at 1299. The same reasoning applies here. Morris will have a significant role in Tripwire's defense and will undoubtedly be a witness at trial. Furthermore, Florida has a strong interest in "affording its residents a forum to obtain relief from intentional misconduct of nonresidents causing injury in Florida." *Licciardo*, 544 F.3d at 1288. Exercising jurisdiction comports with traditional notions of fair play.

Having established a prima facia case for jurisdiction, the burden shifts to Morris to offer evidence that jurisdiction is improper. Morris has failed to carry his burden with affidavits or evidence that offers anything except "conclusory assertions" against exercising jurisdiction. *Stubbs*, 447 F.3d at 1360. For example, to counter GMP's allegations that Morris made fraudulent misrepresentations to GMP, which amounted to fraud and fraud in the inducement, (*see* Doc. 39 ¶¶ 54, 55, 104, 108, 164, 168, 170, 174, 178, 180), Morris states "Plaintiff's Amended Complaint alleges that I personally engaged in fraudulent conduct directed toward GMP. I deny those allegations." (Doc. 45-1, ¶ 27). That is a classic "conclusory

assertion" that the Court need not accept. *See Stubbs*, 447 F.3d at 1360.

Even looking beyond their conclusory nature, Morris' statements still fall short of carrying his burden. Despite concluding that he engaged in no tortious conduct, Morris does not deny engaging in the underlying conduct that GMP asserts constituted tortious behavior. In fact, Morris acknowledges that he performed the acts—but he qualifies that they were performed in his "corporate capacity." (*See* Doc. 45-1, ¶ 29 ("Any statements I made during communications with GMP were made solely in my role as a representative of Tripwire.")). But this qualification cannot save him, as performing tortious acts in a corporate capacity does not defeat jurisdiction. (*See* Section III.A.3-4, *infra*).

Morris' conclusory assertions stand in contrast to other defendants' affidavits that have successfully led to dismissals for lack of personal jurisdiction. In *White*, the defendants rebutted each allegation tying them to intentional torts:

> Similarly, the three corporate officers stated under oath in their affidavits that they had no role in broadcasting, distributing, or licensing the episode at issue and none of them had any contacts such as work, residence, business ownership, property, or financial accounts in Florida. These defendants' affidavits supported their arguments in the motions to dismiss that they did not publish the episode and thus did not commit the tort of defamation in Florida.

*White v. Discovery Commc'ns, LLC*, 365 So. 3d 379, 383 (Fla. 1st DCA 2023). In contrast, Morris' affidavit admits to the underlying acts that GMP alleges constitute intentional torts. (*See* Doc. 45-1 ¶¶ 11, 13, 19–20, 28–29, 41).

Even if the Court accepts Morris' statements as sufficient to carry his burden, Morris' statement still is not enough. GMP has offered sworn statements

confirming Morris' tortious actions and contradicting much of Morris' affidavit.

In Dr. Brunozzi's declaration, he asserts that Morris traveled to Florida to discuss Tripwire supplying GMP with TNT. (Brunozzi Dec. ¶¶ 9-10). This directly conflicts with Morris' statements that "[a]ll communications with [GMP] were conducted remotely via email, phone or videoconference while [Morris] was outside Florida," (Doc. 45-1 ¶ 8), and that "[i]n connection with the transactions referenced in the Complaint, [he] did not personally travel to Florida, negotiate in Florida, or perform any acts or communications directed toward Florida residents other than in [his] official role for Tripwire." (*Id.* ¶ 7). Dr. Brunozzi confirms that Morris had knowledge that GMP was a Florida company. (Brunozzi Dec. ¶ 5).

In Mr. Dorn's declaration, he identifies filings with the Florida Secretary of State showing that Morris set up Tripwire as a Florida limited liability company with a principal place of business in Florida and listed himself (Mr. Ryan J. Morris) as the registered agent. (**Ex. B**, Declaration of Kevin Dorn ¶ 3 ("Dorn Decl.")). This statement contrasts with Morris' sworn statement that he has "not personally conducted, operated, or carried on any business in Florida, nor ha[s Morris] ever registered to do business or paid taxes there." (Morris Decl. ¶ 6). At the same time, Morris acknowledges that he is the Managing Director of Tripwire. (*Id.* ¶ 3).

Given the conflicting sworn statements and evidence that GMP has brought forward in response, the Court should find that GMP has met its burden. At best, Morris' statements create a direct conflict between GMP's allegations and sworn statements that Morris visited Florida, opened a business in Florida, and

committed intentional torts directed at a Florida company and Morris' statement that he did not. In such situation, the Court "must construe all reasonable inferences in favor of the plaintiff." *Stubbs*, 447 F.3d at 1360. For these reasons, the Court should find that GMP has adequately alleged personal jurisdiction.

### 3. Florida's Corporate Shield Doctrine Does Not Insulate Morris from the Consequences of His Tortious Actions.

Morris also argues that, even if the Court has personal jurisdiction, the Court should still dismiss GMP's claims against him under Florida's Corporate Shield Doctrine. But Morris' attempt to evade liability is misplaced. Simply put, Florida's Corporate Shield Doctrine does not apply to allegations of fraud. *Mosseri*, 736 F.3d at 1344 ("Importantly, however, under Florida law, this corporate shield doctrine is inapplicable where the corporate officer commits intentional torts."); *Thorpe v. Gelbwaks*, 953 So. 2d 606, 611 (Fla. 5th DCA 2007) ("The corporate shield doctrine does not protect a corporate officer who commits fraudulent or other intentional misconduct, as alleged here."); *see also Wentz v. Project Veritas*, 2018 WL 11252110, *2 (M.D. Fla. Jan. 31, 2018) (quoting *Thorpe*); *Future Tech. Intern., Inc. v. Tae II Media, Ltd.*, 944 F. Supp. 1538, 1560 n.9 (S.D. Fla. 1996) ("Defendants also suggest that the "corporate shield" doctrine ought to preclude the exercise of jurisdiction over Defendant Park. However, this doctrine is inapplicable to allegations of fraud or other similar misconduct, as is the case here."). Put differently, as noted above, "individual officers [like Morris] are personally liable for torts they commit, even if those torts arise from acts performed within the scope

of their employment." *Exhibit Icons*, 609 F. Supp. 2d at 1299 (citing *Fla. Specialty*, 742 So. 2d at 527–28).

Here, GMP alleges that Morris committed fraud, fraud in the inducement, and commercial bribery directed at a Florida company—GMP. GMP alleged that Morris coaxed GMP to pay substantial deposits to allow Tripwire to obtain TNT from a supplier in Vietnam. (Doc. 1 ¶¶ 54, 55, 164, 168, 174, 178). GMP also alleged that Morris directed additional fraudulent statements at GMP to induce GMP to incur transportation costs to transport a TNT delivery that Tripwire would never make. (*Id.* ¶¶ 104–11, 164, 170, 174, 180). GMP further alleged that Morris paid GMP's then-general counsel Conan Higgins a $700,000 payment as part of a side agreement between Higgins and Morris. (*Id.* ¶¶ 6, 58–66, 90, 157, 165, 175, 213–15). Because fraud, fraud in the inducement, and commercial bribery are intentional torts, Florida's Corporate Shield Doctrine does not apply to this case.

The cases that Morris relies on are inapposite. In both *White* and *LaFreniere*, the court recognizes the intentional tort exception to the Corporate Shield Doctrine but concludes that the complaints at issue failed to adequately plead an intentional tort. In *White*, the plaintiff never submitted sworn evidence to rebut the defendants' sworn statements rebutting in detail the factual allegations supporting the defamation claim. *White*, 365 So. 3d at 383–84. In *LaFreniere*, the court concluded that "the allegations in the amended complaint do not sufficiently state a cause of action alleging an intentional tort as defined in the workers' compensation statute." *LaFreniere v. Craig-Myers*, 264 So. 3d 232, 240 (Fla. 1st

DCA 2018). Neither scenario matches this case.

Unlike *White*, Morris has offered only conclusory statements in rebuttal. And unlike *LaFreniere*, GMP has stated a cause of action alleging both fraud and fraud in the inducement. (*See* Doc. 39 ¶¶ 163–82). Thus, Morris' attempt to hide behind the corporate shield doctrine fails. For these reasons, the Court should not dismiss any claims against Morris based on Florida's Corporate Shield Doctrine.

#### 4. The Complaint Establishes that Morris is Personally Liable for His Tortious Actions.

Morris also argues that GMP cannot hold him personally responsible for the alleged conduct because the Amended Complaint does not allege any basis for holding him personally liable for Tripwire's conduct. (Doc. 45 at 12). This is beside the point. GMP wants to hold Morris personally liable for Morris' conduct.

As a matter of law, "individual officers [like Morris] are personally liable for torts they commit, even if those torts arise from acts performed within the scope of their employment." *Exhibit Icons*, 609 F. Supp. 2d at 1299 (citing *Fla. Specialty*, 742 So.2d at 527–28). Thus, the Court should not dismiss GMP's fraud and fraud in the inducement claims against Morris.

### B. GMP Adequately Pled the Required Elements to State a Claim for Count VI (Commercial Bribery)

Morris paid a kickback to Higgins as part of an agreement between Morris, Higgins, and two other individuals. Morris admitted to these events in a sworn declaration submitted in the United Kingdom. Aside from violating GMP's Code of Conduct and federal criminal law, these actions also fall under Florida's

commercial bribery statute because Higgins owed a duty to GMP as GMP's general counsel at the time Morris paid Higgins $700,000.

Caught red-handed, Morris tries to evade responsibility by arguing that GMP did not plead all required elements. Especially when considering that all reasonable inferences must be drawn in GMP's favor, GMP has adequately pled each element necessary to state a claim under Florida's commercial bribery statute. Morris claims that GMP has not adequately pled (i) a distinct enterprise; (ii) a pattern of criminal activity; (iii) the commercial bribery; or (iv) an injury proximately caused by the activity. (*See* Doc. 45 at 15). Each was adequately pled.

First, GMP adequately pled a distinct "enterprise." The statue's definition of "enterprise" includes any "other legal entity, or any unchartered union, association, or group of individuals associated in fact although not a legal entity." Fla. Statute §772.102(3). Florida courts have adopted a broad interpretation of the enterprise element, which does not require showing a structure with formal decision-making channels. *See, e.g., Bejerano v. State*, 760 So.2d 218 (Fla. 2000).

Applying this broad definition to GMP's allegations, GMP has pled the existence of an enterprise. In the Amended Complaint, GMP details how Morris, Higgins, and two other individuals entered into an agreement to share profits between contracts. (Doc. 39 ¶¶ 28–30, 207). These allegations show that Morris was part of a "group of individuals associated in fact although not a legal entity." Thus, GMP has sufficiently pled the existence of an enterprise.

Second, GMP adequately alleged a pattern of criminal activity. Morris

concedes that GMP pled at least one act: the payment that Morris made to Higgins while he was GMP's general counsel. The Amended Complaint identifies others. To begin, the Amended Complaint makes clear that Morris, Higgins, and their partners intended to pay multiple kickbacks to Higgins. (*See id.* ¶¶ 28-30, 207). In addition, the Amended Complaint details how Morris and Higgins engaged in fraud to coax GMP into entering a contract that Morris and Higgins knew Tripwire could not execute. (*See id.* ¶¶ 39–66 165, 166, 175, 176). These allegations show the necessary pattern for a claim of commercial bribery.

Third, GMP adequately alleged the elements of commercial bribery. Morris claims that GMP failed to do so because it relied on statutory buzzwords, but the Amended Complaint shows otherwise. Morris specifically argues that the Amended Complaint does not allege (i) the specific duty or relationship allegedly implicated under the commercial-bribery framework, (ii) the requisite intent to influence a breach of that duty, and (iii) how criminal bribery qualifies as "criminal activity" for a § 772.103 claim. (Doc. 45 at 15).

Contrary to Morris' assertion, the Amended Complaint details the relationship. It alleges that Higgins accepted a position as general counsel of GMP's parent company and that as part of that position, Higgins agreed not to engage in outside employment. (Doc. 39 ¶¶ 31, 33, 35, 37). It also explained that as part of that employment, Higgins agreed to abide by Global Ordnance's Code of Conduct, which prohibits kickbacks, and a Non-Disclosure Agreement. (*Id.* ¶¶ 33–34, 49–50). In addition, the Amended Complaint states "Higgins owed a duty to

GMP as its **employee** and **attorney**." (*Id.* ¶ 212 (emphasis added)). Duties owed to employers/clients not to reveal confidential information or accept kickbacks are well established and need not be spelled out further.

Similarly, the Amended Complaint outlines the requisite intent to influence a breach of that duty. Morris paid Higgins to betray his ethical obligations as an employee and an attorney, provide Morris with inside information, and help convince GMP to enter into a contract to supply TNT with a company that was not capable of meeting the strict schedule requirements. Even though that intent to breach goes without saying, the Amended Complaint says it. The Amended Complaint alleges that "[i]n exchange for the $700,000 payment, Higgins violated his duty as an employee by not revealing the payment to GMP, violating GMP policies on receiving kickbacks, and revealing confidential information about contract discussion and contract administration issues." (*Id.* ¶ 214).

It further alleges that "[i]n exchange for the $700,000 payment, Higgins violated his duty as an attorney by not revealing the payment to GMP, violating GMP policies on receiving kickbacks, and revealing confidential information about contract discussion and administration. (*Id.* ¶ 215). In addition, the Amended Complaint makes clear that "Morris paid Higgins at least $700,000 while Higgins was an employee of GMP as part of a scheme between Morris, Higgins and others to obtain benefits. (*Id.* ¶ 213). And to summarize the points, GMP concludes that Morris' commercial bribery caused harm to GMP, of "overcharging GMP to facilitate the bribery as well as costs associated with investigating the bribery in

accordance with GMP's ethical obligations." (*Id.* ¶ 216).

Finally, Morris challenges whether commercial bribery qualifies as criminal activity under the applicable Florida statutes. But this matter has already been resolved by the courts, which have repeatedly accepted commercial bribery as an offense covered by Fla. Stat. § 772.104(1). *See, e.g.*, *Ocean Commc'ns, Inc. v. Jewelry Channel, Inc.*, 2020 WL 2042393, *3 n. 2 (S.D. Fla. Apr. 28, 2020); *Zaki Kalaibee Establishment v. McFliker*, 2008 WL 11331781, *8 n.5 (S.D. Fla. Nov. 10, 2008); *Design Pallets, Inc. v. GrayRobinson, P.A.*, 515 F. Supp. 2d 1246, 1258 (M.D. Fla. 2007). Moreover, Morris' challenge to the applicability of commercial bribery as an act covered by Fla. Stat. § 772.104(1) lacks any substance to rebut the allegations. Tellingly, Morris does not explain why it would not be a covered criminal offense. (*See* Doc. 45 at 14).

For these reasons, GMP adequately pled its commercial bribery count against Morris, particularly since the Court must "construe all reasonable inferences in favor of the plaintiff." *Stubbs*, 447 F.3d at 1360.

**C. Count IV (Unjust Enrichment) is Adequately Pled**

Morris also argues that the Court should dismiss Count IV (Unjust Enrichment) under Rule 12(b)(6) for failing to state a claim. Morris' arguments are misplaced. Morris claims that GMP did not allege that Morris received a benefit. Morris is wrong. GMP alleged that Morris received a benefit directly from its deposit payments. (*See* Doc. 39 ¶¶ 198, 201).

### D. The Amended Complaint is Not a Shotgun Pleading

Morris also asks the Court to dismiss—or alternatively order GMP to replead its counts--because the Amended Complaint is an impermissible "shotgun" pleading. In support, Morris cites extensively to *Weiland v. Palm Beach County Sheriff's Off.*, an Eleventh Circuit decision that is self-described as part of "thirty-year salvo of criticism aimed at shotgun pleadings." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1321 (11th Cir. 2015). But reciting *Weiland*'s dicta will get Tripwire only so far. *Weiland*'s holding confirms that GMP's Amended Complaint meets the minimum requirements to avoid dismissal.

In *Weiland*, the Eleventh Circuit reversed the lower court's dismissal of two counts as "shotgun pleadings." *Id.* at 1325–26. The Eleventh Circuit distinguished the complaint's tactic of re-alleging the same numbered paragraphs at the beginning of each count from more problematic tactic of rolling the allegations of each count into every successive count on down the line. *Id.* at 1324. In doing so, the court clarified that "[a] dismissal under Rules 8(a)(2) and 10(b) is appropriate where 'it is *virtually impossible* to know which allegations of fact are intended to support which claim(s) for relief.'" *Id.* (quoting *Anderson v. Dist. Bd. of Trs. Of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 367 (11th Cir. 1996)).

Like *Weiland*, GMP's Amended Complaint does not roll the allegations of each count into each successive count and, instead, only re-alleges discrete paragraphs into each count. By doing so, GMP makes it simple to identify which allegations go with which count—as each count is labeled with the defendant(s) to

which they apply. *See id.* at 1326 (noting a complaint can have faults as long as it is "informative enough to permit a court to readily determine if they state a claim"). Thus, no "virtual impossibility exists" and dismissal is not required. *Id.* at 1325.

In describing its purported confusion over which allegations apply to Morris, Morris argues that the Amended Complaint "repeatedly attribute[s] conduct to 'Tripwire and Morris' 'Tripwire, through Morris,' without clearly identifying what Morris himself allegedly said or did, when he did so, and which specific allegations are intended to satisfy the elements of each claim asserted against him individually." (Doc. 45 at 18). But Morris' argument rings hollow. By specifying that certain actions were taken by Tripwire and Morris," "Tripwire, through Morris," or even Tripwire through Morris, Higgins, and other agents, GMP has provided enough detail to enough to permit a court to readily determine whether the allegations state a claim upon which relief can be granted.

For these reasons, the Court should deny Morris' claim of shotgun pleading.

### E. The Court Should Not Strike Section P of the Amended Complaint

Motions to strike are disfavored in the Middle District of Florida and are rarely granted. *See, e.g., Bryan v. City of Orlando*, Case No: 6:24-cv-641-PGB-DCI, 2024 WL 3690814, at *1 (M.D. Fla. Aug. 7, 2024). Pursuant to Fed. R. Civ. P. 12(f), the court may only strike "from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." "The court enjoys broad discretion in determining whether to grant or deny a motion to strike," and will only be overturned for an abuse of such discretion. *See, e.g., Bernath v.*

*Seavey*, 2017 WL 1743285, at * (M.D. Fla. May 4, 2017) (citation omitted).

A motion to strike should only be granted if "the matter sought to be omitted has no possible relationship to the controversy, may confuse the issues, or otherwise prejudice a party." *Reyher v. Trans World Airlines, Inc.*, 881 F. Supp. 574, 576 (M.D. Fla. 1995) (citations omitted). "Because this is a difficult standard to satisfy, '[m]otions to strike are generally disfavored by the Court and are often considered time wasters.'" *E.g., Bryan*, 2024 WL 3690814, at *1–2; *Gonzalez v. Midland Credit Mgmt., Inc.,* 2013 WL 5970721, at *1 (M.D. Fla. Nov. 8, 2013) (citation omitted). Although a portion of a pleading may be stricken if it is impertinent, scandalous, or legally insufficient, striking is considered a drastic remedy, which, again, is disfavored by the courts. *E.g., Bryan*, 2024 WL 3690814, at *2; *Adams v. JP Morgan Chase Bank, N.A.*, 2011 WL 2938467, at *1 (M.D. Fla. July 21, 2011) (citations and internal quotation marks omitted); *see also Somerset Pharm., Inc. v. Kimball*, 168 F.R.D. 69, 71 (M.D. Fla. 1996) (motions to strike are not favored and are often considered time wasters).

Morris moves to strike Section P of the Amended Complaint because "[t]hese collateral accusations are not necessary to plead any element of GMP's claims arising from its own contract dispute with Tripwire, nor do they bear on any properly pleaded cause of action against Tripwire." (Doc. 45 at 18–19). Contrary to Tripwire's claim, the standard for granting a motion to strike as broad as Tripwire implies. The Court should not grant a motion to strike merely because certain allegations are not necessary to plead an element, but only when the

allegations "ha[ve] no relationship to the controversy." *Reyher*, 881 F. Supp. at 576.

Here, Section P meets this lenient standard. GMP's Amended Complaint details multiple reasons why Morris specifically knew Tripwire could not live up to his promises and statements about Tripwire's ability to deliver large quantities of TNT on a strict schedule that ultimately induced GMP to enter into the contract at issue. Among these reasons, Tripwire's repeated failure to deliver promised explosive products Tripwire was obligated to deliver under other contracts. Thus, while not necessary to prevail, the Section P allegations meet the lenient standard of having more than a possible relationship to the controversy. *See id.*

For these reasons, the Court should deny Tripwire's Motion to Strike.

## IV. CONCLUSION

The Court should deny Morris' Motion, find that the Court has personal jurisdiction over Morris, and confirm that GMP's Complaint meets the Federal Rules of Civil Procedure's minimum pleading standards.

Respectfully submitted this 7 day of April, 2026.

*/s/ Daniel D. Woodruff*
Michael S. Vitale
Florida Bar No. 17136
Email: mvitale@bakerlaw.com
Secondary: ybayala@bakerlaw.com
orlbakerdocket@bakerlaw.com
Daniel D. Woodruff
Florida Bar No. 1059872
Email: dwoodruff@bakerlaw.com
Secondary: lshahsailes@bakerlaw.com
**BAKER & HOSTETLER LLP**

200 South Orange Avenue, Suite 2300
Orlando, FL 32801-3432
Telephone: 407.649.4000
Facsimile: 407.841.0168

Kevin T. Barnett
(admitted pro hac vice)
Email: kbarnett@bakerlaw.com
Kevin Dorn
(admitted pro hac vice)
Email: kdorn@bakerlaw.com
**BAKER & HOSTETLER LLP**
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5403
Telephone: 202.861.1500

Jenna Solari
(admitted pro hac vice)
Email: jsolari@bakerlaw.com
**BAKER & HOSTETLER LLP**
1170 Peachtree Street, Suite 2400
Atlanta, GA 30309-7676
Telephone: 404.682.2333

*Attorneys for Global Military Products, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on April 7, 2026, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

*/s/ Daniel D. Woodruff*
Daniel D. Woodruff